FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

99 FEB 13 FM 4:01

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **FREDDIE LEE DOWDELL, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **vs.** | ) **Civil Action No. CV97-S-2390-NE** |
| | ) |
| **ONA CORPORATION and ONAN** | ) |
| **CORPORATION,** | ) |
| | ) |
| **Defendants.** | ) |

ENTERED

FEB 1 3 1998

### MEMORANDUM OPINION

This action was commenced on September 5, 1997, by 32 current and former African-American employees of Ona Corporation. They sue individually, and, as representatives of others of their heritage employed by Ona at its Huntsville, Alabama manufacturing facility at any time from February 19, 1993,[1] through January 11, 1997.[2] (Complaint ¶ 37.) The case is before the court on the parties' joint request for final class certification, and, approval of a proposed consent decree designed to achieve global settlement of race discrimination claims.

---

[1] The opening date for class membership is based upon: (1) 28 U.S.C. § 1658, establishing a general four year statute of limitations for certain causes of action created by Congress after December 1, 1990; and (2) defendants' February 19, 1997 agreement to toll the statute of limitations for § 1981 claims. (*See* Plaintiffs' Memorandum in Support of the Grant of Preliminary Approval to the Consent Decree at 20-24.)

[2] The closing date for class membership is the day upon which "Ona Corporation removed the permanently defaced bathroom doors and stalls, and instituted a much tougher policy against" the writing of racially offensive graffiti on restroom walls. (Complaint ¶ 41; *see also* Declaration of Rolf Dahl ¶ 6.)

## I. FACTUAL BACKGROUND

### A. The Claims

Plaintiffs' principal complaint is that Ona and Onan[3] failed to undertake prompt and effective measures to eradicate a racially hostile working environment perpetrated by non-managerial, Caucasian employees. They also assert that both defendants discriminated on the basis of race when promoting employees, establishing working conditions, and imposing discipline. Specifically, plaintiffs allege:

> 40. For many years, employees have written, painted, and carved numerous racial graffiti offensive to African-Americans in the men's restrooms in Ona's Huntsville manufacturing facility. Some of the graffiti involve racial slurs, some involve racial insults, some involve offensive statements such as "Hail to the man who killed Martin Luther King, Jr.," and some involve drawings of Ku Klux Klan emblems and drawings of persons in Ku Klux Klan hoods. Some of these statements and drawings were not readily apparent to persons who had not previously seen them, because the markings were on surfaces that had been painted over, and because the light was dim. Various plaintiffs have complained to defendants about the graffiti. When one of the plaintiffs complained to two of the Area Supervisors about the graffiti, he was told that they could not do anything about the graffiti. In or around 1996, another plaintiff suggested to a manager that the restroom stalls be sanded since offensive graffiti remained visible. The defendant Ona Corporation did not sand or replace the bathroom stalls until in or around January 10, 1997.

> 41. The practice of writing racially offensive graffiti in men's restrooms at the Ona Huntsville manufacturing facility is longstanding, but diminished somewhat in the Summer of 1996 when the President of Onan came to the Huntsville plant, addressed a meeting of all employees, and informed them that the company would not tolerate such persistent practices. The practice only ended on January 11, 1997 when Ona Corporation removed the permanently defaced bathroom doors and stalls, and instituted a much tougher policy against such activities.

---

[3] Onan Corporation leased space at its Huntsville plant to Ona Corporation, a wholly-owned subsidary, for the manufacture and assembly of generators, engines, and other products. (*See* Complaint ¶¶ 35-36.)

42.   Until January 11, 1997, the defendant company or companies from time to time painted over racially offensive graffiti.   Parts of the graffiti remained visible, however, because a number of messages had been carved into the metal doors and walls, and other messages had been so heavily painted that they remained visible in relief.   The parts that remained visible reminded plaintiffs and their class of the original graffiti.   Until January 11, 1997, the defendant Ona Corporation failed to take prompt and effective remedial action to eliminate the racially hostile messages, to identify the perpetrators, and to prevent new occurrences.

43.   From time to time, white employees of Ona Corporation have uttered racial slurs against African-American employees.   These comments include use of the word "n-----" and the phrase "go back to Africa."   Until the Summer of 1996, the Ona Corporation did not take effective action against such employees.   In the Summer of 1996, the President of Onan Corporation, Jack Edwards, announced a "zero tolerance" policy for such incidents.   Since that time, Ona has fired a white employee for violating the policy.   Local 2276 of the United Auto Workers is taking the discharged employee's grievance to arbitration.

44.   Ona Corporation has not promoted African-American employees to higher-paid positions, including some supervisory positions.   Various plaintiffs are interested in promotion to supervisory, higher skill, or salaried positions but, on information and belief, have not been considered for such positions.

45.   Ona Corporation has required some African-American employees to work in less favorable conditions than their white counterparts.   For example, from March 1994 through November 1995, one of the plaintiffs was required to do more work than white employees assigned to the same job on an assembly line building control bases and installing them on engines.   A white woman installed the control boxes on the engine but had a helper to build the control boxes.   Plaintiff was left to build and install control boxes by herself.   Although the plaintiff repeatedly asked for assistance, she was only able to obtain help when co-workers had spare time and volunteered to help her.   Other plaintiffs have been required to meet specific quotas.   White employees who replace them are given lower quotas.

46.   Ona Corporation has subjected some African-American employees to harsher discipline than similarly-situated white employees.   For example, one of the plaintiffs was disciplined for one incident of "on duty" telephone use although white employees repeatedly used the telephone while "on duty."   He was denied training, and was ultimately terminated, because of his race.

(Complaint ¶¶ 40-46.)

3

Plaintiffs contend that such circumstances and practices existed in the Huntsville plant for a number of years and, therefore, constituted a "continuing violation" of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e et seq. (Complaint ¶ 47.) The complaint seeks declaratory and equitable relief, compensatory and punitive damages, prejudgment interest, costs, attorneys' fees, and expenses.

## B. Events Preceding Suit

During the summer of 1996, eighteen employees filed race discrimination charges with the Equal Employment Opportunity Commission.[4] Contemporaneously, the National Association for the Advancement of Colored People informed the Washington, D.C. based Lawyers' Committee for Civil Rights Under Law[5] ("Committee") that

> there were a group of individuals who had problems, some of whom had filed EEOC charges. And they then invited [Committee attorneys] to a meeting of the local chapter of the NAACP to whom these individuals had gone for assistance in filing their charges in order to explain what it was the law did and did not provide for and what the best means of action would be.

(Statement of Richard T. Seymour during hearing held September 25, 1997: see Transcript (Doc. No. 30) at 15 ["T"].) The Committee

---

[4] Fifteen of the eighteen charging parties are named plaintiffs in this action.

[5] See Declaration of Richard T. Seymour, appended to plaintiffs' memorandum in support of the grant of preliminary approval to the consent decree (Doc No. 12) ¶ 4:

> 4. The Lawyers' Committee was founded in 1963 by the leaders of the American Bar, at the request of President Kennedy, in order to help defend the civil rights of minorities and the poor. In addition to our national office in Washington, D.C., we have local affiliates [in various cities across the country].... The Lawyers' Committee is a tax-exempt, nonprofit civil rights organization under § 501(c)(3) of the Internal Revenue Code.

4

thus began to investigate the circumstances leading to this action virtually simultaneously with the EEOC.

The Committee advised defendants during August of 1996, that it intended to represent their African-American employees in connection with claims of race discrimination. That contact led to informal exchanges of information. The Committee

> provided the company with the kind of details about the claims that would ordinarily have been provided in formal discovery and the company provided responses, copies of documents that it had, and there were a substantial number of communications by telephone, in person, and by letter in order to nail down further details. [T. at 5.]

Defendants responded to the EEOC's initial request for information on September 10, 1996, and provided: general background information about the companies; copies of written rules, practices and procedures relating to the issues raised in the EEOC charges; the procedure by which individuals could register complaints of discrimination or harassment with management; a narrative of complaints made in accordance with that procedure; the names of persons possessing relevant information concerning the charges of discrimination; copies of daily work assignment sheets, time cards, attendance records, and payroll cards; and, copies of signs posted in restrooms, threatening termination for writing racially offensive graffiti. Defendants responded to an EEOC request for additional information on many of these same matters on October 7, 1996.

The first conference at which plaintiffs' claims were debated in detail by Committee attorneys and defense counsel occurred on

5

September 24, 1996, in Washington, D.C. (T. at 5; *see also* Declaration of Donald R. Livingston ["Livingston Decl."] ¶ 3.) Thereafter, by letters dated October 17, 1996, and November 27, 1996, the Committee clarified plaintiffs' allegations. Defendants responded on December 3, 1996, and provided documents concerning: the occurrence and removal of graffiti in plant restrooms; job training; job assignments; promotional policies and practices; overtime assignment; overtime equalization policies and practices; solicitation policies and practices; anti-harassment policies and training; and, complaint reporting procedures. That response also set forth defendants' position on specific complaints of identified employees.

Committee attorneys toured defendants' plant on December 6, 1996, and inspected each restroom. They were escorted by several plaintiffs, company representatives, and officers of the local United Electrical Workers Union. (T. at 5; Livingston Decl. ¶ 4.) That survey, comparable to a Rule 34 inspection, produced tangible evidence[6] and precipitated "the first discussion of the possibility of resolution of the case." (T. at 5.)

> MR. SEYMOUR: The visual inspection was the crucial piece of information, Your Honor.... [A]s we went through and attempted to make a catalogue of what it was that we saw, there were discussions ongoing with the company about the degree of visibility versus the degree of obscurity of particular things, about just how exposed people really would be to some particular depiction or writing that was on the wall. That was the key factor. And I think it's fair to say that that drove a great deal of the settlement on both sides. [T. at 26.]

---

[6] By agreement of the parties, toilet walls were removed and stored, "in the event it was needed as evidence in the case." (T. at 24.)

6

Another conference of counsel, "devoted exclusively to the possibility of settlement," occurred on January 2, 1997. (T. at 6.) Defendants provided additional documents addressing, among other matters: the racial composition of the plant's work force and supervisors; details of Ona's investigation of an incident involving racially-offensive graffiti; Ona's practices for filling maintenance department positions; Ona's policies for assignment and equalization of overtime work; and, janitorial maintenance of plant restrooms.

EEOC Investigator Emma Evans conducted an on-site investigation during February of 1997. She toured the plant and interviewed plant officials, union representatives, and bargaining unit employees.

Counsel for all parties conferred on February 4, 1997, to further explore the possibility of settlement. (T. at 6, 26-27.) The exchange was not instantly fruitful, however.

> Negotiations sort of stopped right there at that point while we agreed that further information was necessary on some of the [in-plant] promotional claims and so on. We then obtained a database from the company providing everyone's date of employment and were able to go further with the negotiation. [T. at 6.]

The parties' settlement negotiations regained momentum on March 17, 1997, when defendants disclosed the names of all African-Americans employed by Ona Corporation on or after November 21, 1991.[7] Defendants later supplemented that information with a

---

[7] *See* remarks of Richard T. Seymour during preliminary fairness hearing, T. at 51 ("The date of November 21, 1991 comes about because that is when Congress amended section 1981 to include claims after the formation of the contract. So that has to be, you cannot go back farther than November 21, 1991").

7

computer disk containing the inclusive employment dates for each person and, still later, another report listing the name and service dates of each African-American employee.

From August of 1996 until September of 1997, therefore, investigations commenced independently by the EEOC and the Committee progressed along parallel paths. The two probes began to converge as the parties engaged in informal discovery, exchanging information in an effort to constrict the areas of dispute. Settlement discussions eventually dominated the dialogue, receiving impetus from factors such as these:

- ■ the Committee concluded that it would be "extremely difficult to identify which particular plaintiffs and class members have potentially valid promotional claims" and, accordingly, "it would be difficult for plaintiffs to prevail on promotional claims";[8]

- ■ defendants disclosed their intent to cease all manufacturing operations at Ona's Huntsville plant during 1998,[9] and "the lack of any other facility of the defendants in the Huntsville area, [made] injunctive relief against the defendants of questionable value to the plaintiff class."[10]

The parties reached agreement on September 5, 1997, following intensive, all-night negotiations. The terms of settlement are recorded in the proposed Consent Decree. Defendants simultaneously entered into a conciliation agreement with the EEOC, regarding the 18 persons who filed charges with that agency. That agreement incorporates the terms of the Consent Decree by reference, and is

---

[8] Stipulations recorded in Consent Decree (Doc. No. 14) ¶¶ 6, 7; see also remarks of Richard T. Seymour during preliminary fairness hearing, T. at 12, 28-31.

[9] See defendants' memorandum in support of preliminary approval of consent decree (Doc. No. 8) at 3; Declaration of Rolf Dahl ¶¶ 3-5.

[10] Proposed Consent Decree ¶ 8.

conditioned upon court approval of that document.

## 1. **Terms of settlement**

The principal terms of the proposed settlement agreement are

as follows:

(1) The parties stipulate to the creation of a settlement class, pursuant to Rules 23(b)(2), (b)(3), Fed. R. Civ. P., consisting of "[a]ll African-Americans who have been employed by Ona Corporation at its Huntsville manufacturing facility at any time from February 19, 1993, through January 11, 1997";[11]

(2) Defendants agree to pay the sum of $2,500,000 to the named plaintiffs and members of the settlement class, to be allocated as follows: each of the 32 named plaintiffs shall receive an incentive award in the amount of $10,000, in addition to his or her share under the settlement formula described hereafter; the balance of $2,180,000 shall then be distributed among the named plaintiffs and other members of the settlement class according to a formula based upon the number of days that each person was employed from November 21, 1991, through January 11, 1997;

(3) For purposes of this settlement only, class members are not required to produce evidence of lost promotional opportunities, discriminatory job assignment, or personal exposure to the harassment alleged in the Complaint; moreover, class members are not required to proffer evidence of emotional distress or humiliation, and are not required to produce individual documentation of such emotional distress or humiliation, or of any physical manifestations of such distress; and,

(4) Defendants agree to pay the reasonable attorneys' fees, costs, and expenses incurred by class counsel, in addition to the $2,500,000 class settlement award.

## C. **Commencement of Suit**

Counsel for the settling parties presented this court a complaint, an answer, the proposed Consent Decree, and a joint request for conditional class certification on September 5, 1997.

---

[11] *Id.* ¶ 4.

9

The fact of settlement does not diminish this court's responsi-
bilities, except in one respect. "Confronted with a request for
settlement-only class certification, a district court need not
inquire whether the case, if tried, would present intractable
management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the
proposal is that there be no trial." *Amchem Products, Inc. v.
Windsor*, __ U.S. __, 117 S.Ct. 2231, 2248, 138 L.Ed.2d. 297
(1997).[12]

In all other respects, the remaining Rule 23 class
certification criteria "demand undiluted, even heightened,
attention in the settlement context." *Id.* "Such attention is of
vital importance, for a court asked to certify a settlement class
will lack the opportunity, present when a case is litigated, to
adjust the class, informed by the proceedings as they unfold." *Id.*

Thus, even though settlement "is relevant to a class

---

[12] In the memorandum presented in support of the grant of final approval
to the consent decree, class counsel draw, on pages 5 and 6, a distinction
between this action and the request for settlement-only class certification
rejected by the Supreme Court in Amchem Products, Inc. v. Windsor, __ U.S. __,
117 S.Ct. 2231, 138 L.Ed.2d 689 (1997):

> *Amchem Products* involved the unusual situation of a
> settlement-only *case*, not just a settlement *class*, in which the
> parties never intended litigation and which would die if approval
> were not given to the settlement. *Id.* at 2239 ("The class action
> thus instituted was not intended to be litigated") and 2248
> ("Permitting class designation despite the impossibility of
> litigation"). *Dowdell*, by contrast, is a litigation vehicle that
> was provisionally settled but which will be litigated by both sides
> to the hilt if final approval is not granted to the settlement.
> During the negotiations, plaintiffs made clear that a lawsuit would
> be filed with or without a settlement. In light of this certainty,
> plaintiffs obtained from the defendant[s] a waiver of the statute of
> limitations for § 1981 claims so that the discussions could continue
> without plaintiffs being required to file the Complaint immediately.
> At all times, it was clear that vigorous litigation was the only
> alternative to settlement, and neither side has left the other in
> any doubt as to the vigor of the litigation that will still occur
> absent final approval of the settlement.

certification," and, it "is a factor" to be considered "in the calculus," the mere fact of agreement

> does not inevitably signal that class action certification should be granted more readily than it would be were the case to be litigated. For reasons the Third Circuit aired, see [*Georgine v. Amchem Products, Inc.*,] 83 F.3d 610, 626-635 (1996), proposed settlement classes sometimes warrant more, not less caution on the question of certification.

*Id.* at 2248-49 and n.16.

## D.   **Preliminary Fairness Hearing**

Accordingly, this court began its inquiry by conducting a preliminary fairness hearing[13] in Birmingham, Alabama on September 25, 1997, to determine whether there was,

> in effect, "probable cause" to submit the proposal to members of the class and to hold a full-scale hearing on its fairness, at which all interested parties [would] have an opportunity to be heard and after which a formal finding on the fairness of the proposal [would] be made.

*In re: Mid-Atlantic Antitrust Litigation*, 564 F. Supp. 1379, 1384 (D. Md. 1983).

Counsel advised the court of the facts and circumstances leading to the proposed Consent Decree and EEOC conciliation agreement.   On the basis of that presentation and the pleadings, supplemented by evidentiary submissions and briefs of counsel, the court determined the proposed settlement was within the range of possible approval, and, that a class should be conditionally certified.[14]

---

[13] *See, e.g.,* Manual for Complex Litigation Third § 30.41 (1995)("Approval of class action settlements involves a two-step process. First, counsel submit the proposed terms of settlement and the court makes a preliminary fairness evaluation.").

[14] Fed. R. Civ. P. 23(c)(1) provides: "As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. <u>An order under this subdivision may</u>

11

**E.    Notice to Class**

Consequently, this court ordered on October 22, 1997, that notice be provided to all members of the settlement class by the following means:

(1)  the first notice — describing the proposed settlement and allowing class members to either opt-out of the settlement class or file objections by the close of business on November 26, 1997 — was mailed *via* first-class, United States mail, sufficient postage prepaid, to the last known address(es) of each member of the putative class on October 23, 1997; and,

(2)  a second notice was published in the major area newspapers with daily circulation: *The Decatur Daily,* on October 26 and 27, and November 2, 5, 9, and 12, 1997; and *The Huntsville Times,* on October 26 and 29, and November 5, 6, 9, 12, and 16, 1997.

In the opinion of this court, the mailed and published notices were reasonably calculated under all of the circumstances to: inform interested parties of the essential terms of the proposed settlement; explain how (and where) additional information on the detailed terms of settlement could be obtained; and, afford class members reasonable opportunity to either opt-out, or present objections to the terms of settlement. The notices satisfactorily conveyed to class members all information relevant to an informed decision.

The court therefore finds that notice to the class accorded constitutional due process, and, complied with the criteria of Federal Rule of Civil Procedure 23(c)(2):

(2) In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the

be conditional, and may be altered or amended before the decision on the merits." (Emphasis supplied.)

12

best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.  The notice shall advise each member that (A) the court will exclude the member from the class if the member so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if the member desires, enter an appearance through counsel.

**F.    Objections**

No member of the proposed class elected to opt-out, but several filed objections.

- Two persons complained that the ending dates of their respective periods of employment were not correctly stated in "Attachment A" to the proposed Consent Decree.[15]

  - Upon investigation, the parties' agreed and made corrections which resulted in withdrawal of both objections.[16]

- Thirteen members of the proposed class jointly objected to payment of incentive awards to the named plaintiffs.[17]

  - Upon reconsideration, however, those persons later withdrew their objection.[18]

---

[15] Sharon Scott asserted the last day of her employment was January 11, 1997, rather than November 25, 1995 (Doc. No. 15), and Revelar Love claimed his termination date was October 26, 1993, rather than August 12, 1993 (Doc. No. 20).

[16] Doc. No. 18 (Scott) and No. 21 (Love).

[17] Doc. No. 17 (letter dated October 29, filed November 18, 1997, and signed by Bernice Darwin, Larry Edwards, Mattie M. Langford, Antonia Woods, Bessie Jordan, Harold E. Turner, John Ayers, Judith L. Orr, Peter H. Wade, Boyd Turner, Charles Nelson, Wayne Jones, and Gaylond Moore), providing in substance that each signatory desired to "remain a member of the Class in the case," but nevertheless "wish[ed] to object to the part of the settlement that entitles 32 ... members of the class to receive an additional $10,000 ... each over the other members of the same class in the case."

[18] Doc. No. 23 (letter filed December 5, 1997, and signed by each of the persons listed in the preceding note) providing in pertinent part that:

> Since sending in our objections [to the incentive award], we have reconsidered those objections and now withdraw them.  We understand that the overall value of the settlement to each of us, as well as other class members, is substantial.  We recognize that if the case had not been started there would not be a settlement.

> We also believe that the settlement, as it is, will be good for all of the class members and we want the Judge to approve it.

13

> ■   The final objection, filed by Dorothy Harper, opposed the incentive awards.[19]

## G.   Final Fairness Hearing

This court entered an order on January 9, 1998, requiring notice to the class of a hearing to be held on January 26, 1998, at the United States Courthouse in Huntsville, Alabama, at which arguments and evidence could be presented in support of or in opposition to the proposed settlement.[20]   The order instructed that:

> 2.   The remaining objector is not required to attend the hearing, but shall be entitled to testify at the hearing and to ask questions of counsel for plaintiffs.
>
> 3.   Members of the proposed class are not required, but shall be entitled to attend the hearing.  At the hearing, the Court shall consider the fairness, adequacy, and the reasonableness of the proposed settlement in light of the information and legal authorities previously provided by the parties, the objection, any statement by the objector at the hearing, and the statements of counsel at the hearing.

---

[19] Essentially, Ms. Harper contends that she is equally, if not more, deserving of such an award than the named plaintiffs. See Doc. No. 16, providing:

> I am filing this objection because, I am one of those who will not receive the additional Ten Thousand dollars.  As one of the employees, a group of about 34 black employees, who first went to management on March 11, 1996 to complain about the harassment, racial slurs on the bathroom walls, the message left on the telephone and, hostial [sic] environment.
>
> I, also received criticism name calling, whispers behind my back and in general being treated different from white employees as well fearing for my safety.  I worked with others in getting help from NAACP, EEOC, the lawyers committee.  We tried to get help from the union.  I, also help in getting the fact and information to the NAACP, EEOC, UNION and the Lawyers committee.  I met several times when we started with NAACP and the Lawyers committee before the Lawyers committee asked me to leave the group and that they would pick me back up later.  I file a complaint on the company and the union, and met with EEOC as other did on these issues.  However I do not understand why a charge was not issued on my behalf against the company and union.  I supplied more facts and information than most of the employees (the group of 32) that is represented by the lawyers committee.

[20] Fed. R. Civ. P. 23(e) provides: "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

14

    4.    A copy of the attached notice shall be mailed no later than January 9, 1998, to the last known address of each plaintiff and of each member of the proposed settlement class. The defendants shall forthwith provide counsel for plaintiffs with the Social Security Numbers and dates of birth of the ten class members whose prior Notices were returned undelivered, and the plaintiffs and defendants shall make reasonable effort to locate current addresses for, and cause the attached Notice to be mailed to these ten class members.

    5.    The parties shall report to the Court on or before January 21, 1998, of their efforts to obtain current addresses for these class members, and, the names of all plaintiffs and class members whose copies of the attached Notice were returned undelivered.

(Order entered January 9, 1998 (Doc. No. 29).)

The notice of final hearing published pursuant to that order complied with all standards listed in the *Manual for Complex Litigation Third* § 30.212, at 228. Copies were delivered to all named plaintiffs and putative class members.[21] Many class members attended the hearing, but only one person, Dorothy Harper, voiced an objection to the proposed settlement. Ms. Harper's testimony essentially was an embellishment of her written objection.[22]

## II. APPLICATION OF LAW TO FACTS

### A.    Class Certification

Rule 23 of the Federal Rules of Civil Procedure governs the certification of class actions. District courts are required to conduct a "rigorous analysis" of that rule's requirements,[23] even when presented a request for settlement-only class certification.

---

[21] *See, e.g.,* Doc. No. 31 (joint report of the parties concerning their efforts to provide notice to class members whose prior notices were returned undelivered); Doc. No. 33 (Declaration of Rolf Dahl); Doc. No. 35 (supplemental report of the parties); and, Doc. No. 37 (corrected supplemental report).

[22] See note 19 *supra*.

[23] General Tele. Co. of the Southwest v. Falcon, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

15

*Amchem Products, Inc. v. Windsor,* ___ U.S. ___, 117 S.Ct. 2231, 2248, 138 L.Ed.2d 297 (1997).

Prior to the decision in *Amchem Products,* four circuits held "settlement obviates or reduces the need to measure a proposed class against the enumerated Rule 23 requirements." *Id.* at 2247 (citing cases). The Supreme Court emphatically rejected that view.

> The safeguards provided by the Rule 23(a) and (b) class-qualifying criteria, we emphasize, are not impractical impediments—checks shorn of utility—in the settlement class context. First, the standards set for the protection of absent class members serve to inhibit appraisals of the chancellor's foot kind—class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness.
>
> Second, if a fairness inquiry under Rule 23(e) controlled certification, eclipsing Rule 23(a) and (b), and permitting class designation despite the impossibility of litigation, both class counsel and court would be disarmed. Class counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer, ... and the court would face a bargain proffered for its approval without benefit of adversarial investigation....
>
> Federal courts, in any case, lack authority to substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is "fair," then certification is proper. ...

*Id.* at 2248-49. A district court retains broad discretion in deciding whether to certify a class,[24] but *Amchem Products* mandates that such discretion be exercised within the framework of Rule 23.

### 1. Class Certification Requirements

The parties seeking class certification bear the burden of proof. *See General Telephone Company of the Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

---

[24] *E.g., Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100, 101 S.Ct. 2193, 2200, 68 L.Ed.2d 693 (1981).

Rule 23(a) states four threshold requirements applicable to all class actions: (1) *numerosity* ("the class is so numerous that joinder of all members is impracticable"); (2) *commonality* ("there are questions of law or fact common to the class"); (3) *typicality* (the named parties' claims or defenses "are typical ... of the class"); and (4) *adequacy of representation* ("the representative parties will fairly and adequately protect the interests of the class").

In addition to satisfying all prerequisites of Rule 23(a), parties seeking class certification must show that the action is maintainable under at least one of the three categories of Rule 23(b). Here, plaintiffs sought certification under Rules 23(b)(2) and 23(b)(3).[25]

Rule 23(b)(2) permits class actions for declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds generally applicable to the class." It is intended primarily for civil rights actions. *Amchem Products,* 117 S.Ct. at 2245 ("Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of 23(b)(2) class actions). However, a (b)(2) class is expressly limited to cases in which "final injunctive relief or corresponding declaratory relief with respect to the class as a whole" will be appropriate and, thus, deliberately excludes actions in which monetary damages are the prime, or sole relief sought. Plaintiffs

_____

[25] *See, e.g.,* Complaint ¶ 37 ("Plaintiffs bring this action on their own behalf, and on behalf of the following class, under Rules 23(b)(2) and 23(b)(3)").

17

stipulate, however, that "the anticipated closure of the Huntsville
plant, and the lack of any other facility of the defendants in the
Huntsville area, makes injunctive relief against the defendants of
questionable value to the plaintiff class."[26]

Thus, this court's subsequent analysis will, of necessity,
focus upon Rule 23(b)(3).

#### (a)  Rule 23(a)(1): *numerosity*

Rule 23(a)(1) requires that the proposed class be "so numerous
that joinder of all members is impracticable."  "The reason for
[the numerosity] requirement is obvious.  Only when joinder is
impracticable is there a need for a class action device." 1 Herbert
B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.01, at 3-4
(3d ed. 1992).

Revised Attachment A to the Consent Decree lists 141 African-
American persons who presently are, or formerly were, employees of
Ona Corporation at its Huntsville plant.  That is sufficient to
satisfy the numerosity requirement.  "While there are no rigid
numerical guidelines for determining impracticability of joinder,
courts have observed that generally less than 21 is inadequate;
more than 40 is adequate; and numbers in between 21 and 40 are
given varying treatment." 5 James Wm. Moore *et al.*, *Moore's Federal
Practice* ¶ 23.22[3][a], at 23-63 (3d ed. 1997); *see also Cox v.
American  Cast  Iron  Pipe  Co.*,  784  F.2d  1546,  1553  (11th
Cir.)(quoting  earlier  edition  of  *Moore's*  with  approval),  *cert.*

---

[26] Consent Decree ¶ 8.

*denied*, 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986).[27]

### (b)   Rule 23(a)(2): *commonality*

Rule 23(a)(2) requires that there be "questions of law *or* fact common to the class" to justify certification.   The commonality requirement, together with the numerosity test of Rule 23(a)(1), "form the underlying conceptual basis supporting class actions." Newberg, *supra* § 3.10, at 3-47.

> The class-action was designed as an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. ... Class relief is peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class. ... For in such cases, the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23.

*Falcon*, 457 U.S. at 155, 102 S.Ct. at 2369 (citations and internal quotation marks omitted).

Rule 23(a)(2)'s requirement that there simply be "questions of law or fact common to the class" is less stringent than the demand of Rule 23(b)(3) that common questions "<u>predominate</u> over any questions affecting only individual members."[28]   The commonality

---

[27] As plaintiffs' counsel note in brief (Doc. No. 12):

> The imminent closing of the manufacturing facility is another factor demonstrating the impracticability of joinder.   The common thread among class members, other than their common claims, has been that the vast majority were current employees of the same employer. They see each other on a regular basis at work.   That thread has begun to be severed.   In the ordinary course of events, one would expect that some of the class members will leave the Huntsville area in search of comparable employment.   Those who leave would find it difficult to conduct litigation at a distance.   Such dispersion is a legitimate fact to consider in determining whether joinder is impracticable. *Kilgo v. Bowman Transportation Co., Inc.*, 789 F.2d [859], 878 [(11th Cir. 1986)].

[28] "The Rule 23(a)(2) prerequisite requires only a single issue common to the class." 1 Newberg on Class Actions § 3.12, at 3-69.

prerequisite of Rule 23(a)(2) thus is subsumed within Rule 23(b)(3)'s predominance determination. *See, e.g., Sollenbarger v. Mountain States Telephone & Telegraph Co.,* 121 F.R.D. 417, 423 (D.N.M. 1988). This court therefore will discuss the commonality issue in the context of Rule 23(b)(3) *infra.*

### (c)  Rule 23(a)(3): *typicality*

Rule 23(a)(3) requires that "the claims ... of the representative parties [be] typical of the claims ... of the class." Class representatives must possess the same interests and suffer the same injuries as the class members. *Sollenbarger,* 121 F.R.D. at 424. Typicality does not demand identical factual circumstances; however, the claims of the named plaintiffs and the class members must be based on the same legal or remedial theory. *Id.* at 430.

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.  In other words, when such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to the class, and that wrong includes the wrong to the plaintiff.  Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.

Newberg, *supra* § 3-13, at 3-76 (footnote omitted). In other words, when the interests of the representative parties are sufficiently aligned with those of the putative class, then the named plaintiffs, in pursuit of their personal claims, also will advance the interests of class members.

Based upon a review of the pleadings and representations of

20

plaintiffs' counsel,[29] this court finds that the claims of the 32 named plaintiffs are typical of the class as a whole.

### (d) Rule 23(a)(4): *adequacy of representation*

Rule 23(a)(4) allows certification only if "the representative parties will fairly and adequately protect the interests of the class." Assessment of the adequacy of representation turns upon two subsidiary issues: (1) whether representative parties have common interests with unnamed class members; and, (2) whether the representative parties will vigorously prosecute the interests of the class through qualified and competent counsel.

The first criterion is synonymous with the typicality requirement of Rule 23(a)(3): *i.e.*, if the named plaintiffs' claims are not typical of the class, then the representative parties cannot fairly and adequately protect the interests of absent class members. *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996)("The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members"). As previously discussed, the typicality prerequisite of Rule 23(a)(3) has been met, and this court now embellishes that finding with these determinations: no conflicts have been demonstrated between the claims of the named plaintiffs and the interests of absent class members; and, in the event of trial, the representative parties would vigorously

---

[29] *See* plaintiffs' memorandum in support of grant of preliminary approval to the consent decree (Doc. No. 12) at 7-8.

21

prosecute the interests of the class.

Competence of counsel is the other component of the adequacy test. Plaintiffs' attorneys have extensive experience litigating similar civil rights actions in courts throughout the country. Neither defendants nor this court question their skill or ability to vigorously and competently represent the class.

### (e) Rule 23(b)(3)

In addition to the foregoing criteria of Rule 23(a), parties seeking certification must satisfy one of the three subsections of Rule 23(b). Here, the parties seek certification of a settlement class pursuant to Rule 23(b)(3), which requires the court to find that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis supplied).

Subdivision (b)(3) thus parallels subdivision (a)(2), in that both require the existence of common questions of law or fact. Even so, subdivision (b)(3) contains the more stringent requirement that common issues "predominate" over individual issues. Moreover, it adds the criterion of "superiority" to Rule 23's list of qualifications for certification.

> In adding "predominance" and "superiority" to the qualification-for-certification list, the Advisory Committee sought to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." ... Sensitive to the competing

22

tugs of individual autonomy for those who might prefer to go
it alone or in a smaller unit, on the one hand, and systemic
efficiency on the other, the Reporter for the 1966 amendments
cautioned: "The new provision invites a close look at the case
before it is accepted as a class action...." ...

*Amchem Products, Inc. v. Windsor*, __ U.S. __, 117 S.Ct. 2231, 2246,
138 L.Ed.2d 689 (1997)(citations omitted).

### (i)  Commonality: Rules 23(a)(2) and 23 (b)(3)

Rule 23(a)(2) "does not require that all ... questions of law
and fact raised by the dispute be common." *Cox v. American Cast
Iron Pipe Co.*, 784 F.2d at 1557 (emphasis supplied).  Rather, the
test for commonality "is qualitative rather than quantitative —
that is, there need be only a single issue common to all members of
the class." 1 *Newberg on Class Actions* § 3.10, at 3-50.  Further,
the rule "requires only that resolution of the common questions
affect all or a substantial number of the class members." *Shipes v.
Trinity Industries*, 987 F.2d 311, 316 (5th Cir.), *cert. denied*, 510
U.S. 991, 114 S.Ct. 548, 126 L.Ed.2d 450 (1993).

This case meets the requirements of Rule 23(a)(2).  At a
minimum, the following issues — mixed questions of fact and law
bearing upon defendants' liability — are suitable for class-wide
resolution:

(1)  Did the racial harassment alleged by plaintiffs occur?

(2)  If so, for what period of time did it persist?

(3)  Was the pattern of such harassment sufficiently pervasive
and severe as to create a working environment that a
reasonable person would find offensive?

(4)  Did defendants know, or should they reasonably have known
of such racial harassment?

23

(5)   Did defendants fail to take prompt and effective action to stop the behavior?

(6)   If so, was defendants' failure to act, or to take reasonably effective action to eradicate the racially offensive conduct, the product of such factors as malice, recklessness, or callous indifference to plaintiffs' federally protected rights?

Without doubt, there are atypical questions of fact bearing upon the issue of individual damages, such as the temporal expanse of each class member's exposure to the offensive conduct, and, his or her subjective reaction to it.   Even so, "the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988); *see also Jenson v. Eveleth Taconite Co.*, 139 F.R.D. 657, 664 (D. Minn. 1991)("The commonality requirement may be met if the common question goes to liability despite individual differences in damages").   The district court in *Jenson* certified a class in a sexual harassment suit over an employer's argument that

> reactions to profanity, pornography, or other potentially offensive material are highly individualized. The Court does not disagree.   The Court finds, however, that the common question of law is not how an individual class member reacted, but whether a reasonable woman would find the work environment hostile.... As such, plaintiffs' claims meet the commonality requirement.

*Jenson*, 139 F.R.D. at 665 (citations omitted).

Accordingly, this court finds that the commonality requirement of Rule 23(a)(2) is satisfied.   It remains to be seen whether those

24

common issues "predominate over any questions affecting only individual members" of the class.

### (ii) Predominance

There is no precise test for determining whether common questions of law or fact predominate over any issues affecting only individual members of the class. Rather, Rule 23(b)(3) requires a pragmatic assessment of the entire action: "That inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Amchem Products*, 117 S.Ct. at 2249.[30]

Uncommon questions of fact bearing upon the issue of individual damages — *i.e.*, the scope of each person's exposure to the racially hostile environment, and, the gravity of any psychological injury caused by it — undoubtedly would require separate consideration if this case proceeded to trial in the posture of a class action.

In that respect, the facts of this case arguably bear some, albeit slight, resemblance to mass tort accidents, in which a large number of persons sustain disparate injuries in a single,

---

[30] In a footnote to this statement, the Court added:

> In this respect, the predominance requirement of Rule 23(b)(3) is similar to the [typicality] requirement of Rule 23(a)(3) that "claims or defenses" of the named representatives must be "typical of the claims or defenses of the class." The words "claims or defenses" in this context—just as in the context of Rule 24(b)(2) governing permissive intervention—"manifestly refer to the kinds of claims or defenses that can be raised in courts of law as part of an actual or impending law suit." *Diamond v. Charles*, 476 U.S. 54, 76-77, 106 S.Ct. 1697, 1711, 90 L.Ed.2d 48 (1986)(O'CONNOR, J., concurring in part and concurring in judgment).

*Amchem Products*, 117 S.Ct. at 2249 n.18.

25

catastrophic event. The Advisory Committee cautioned against class
certification in such actions.

> A "mass accident" resulting in injuries to numerous persons is
> ordinarily not appropriate for a class action because of the
> likelihood that significant questions, not only of damages,
> but of liability and defenses of liability, would be present,
> affecting the individuals in different ways. In these
> circumstances an action conducted nominally as a class action
> would degenerate in practice into multiple lawsuits separately
> tried.

Advisory Committee Notes to 1966 Amendment, 28 U.S.C.A. Rule 23, at

385-86. As the Sixth Circuit observed, however, the existence of

damage issues peculiar to each member of the class does not compel

the conclusion that a (b)(3) class is improper.

> The procedural device of a Rule 23(b)(3) class action was
> designed not solely as a means for assuring legal assistance
> in the vindication of small claims but, rather, to achieve the
> economies of time, effort, and expense. However, the problem
> of individualization of issues is often cited as a
> justification for denying class action treatment in mass tort
> accidents. While some courts have adopted this justification
> in refusing to certify such accidents as class actions,
> numerous other courts have recognized the increasingly
> insistent need for a more efficient method of disposing of a
> large number of lawsuits arising out of a single disaster or
> single course of conduct. In mass tort accidents, the factual
> and legal issues of a defendant's liability do not differ
> dramatically from one plaintiff to the next. No matter how
> individualized the issues of damages may be, these issues may
> be reserved for individual treatment with the question of
> liability tried as a class action. Consequently, the mere
> fact that questions peculiar to each individual member of the
> class remain after the common questions of the defendant's
> liability have been resolved does not dictate the conclusion
> that a class action is impermissible.

Sterling v. Velsicol Chemical Corp., 855 F.2d 1188, 1196-97 (6th

Cir. 1988)(internal citations and footnotes omitted).

On the other hand, it also could be argued that this case

bears some similarity to complex, product liability actions, in

which a large number of persons — scattered in time and space over

26

the period and places of a product's distribution — sustain

diverse injuries. The problem with certifying such cases as class

actions lies in the very real danger that significant questions,

not only of individual damages, but also of the defendant's

liability and defenses to liability, often arise and predominate

over common questions of fact or law.

> In the typical mass tort situation, such as an airplane
> crash or a cruise ship food poisoning, proximate cause can be
> determined on a class-wide basis because the cause of the
> common disaster is the same for each of the plaintiffs.
>
> In products liability actions, however, individual
> issues may outnumber common issues. No single happening or
> accident occurs to cause similar types of physical harm or
> property damage. No one set of operative facts establishes
> liability. No single proximate cause applies equally to each
> potential class member and each defendant. Furthermore, the
> alleged tortfeasor's affirmative defenses (such as failure to
> follow directions, assumption of the risk, contributory
> negligence, and the statute of limitations) may depend on
> facts peculiar to each plaintiff's case.

*In re Northern District of California, Dalkon Shield IUD Products*

*Liability Litigation*, 693 F.2d 847, 853 (9th Cir. 1982)(citation

omitted), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d

1015 (1983); *see also In re American Medical Systems, Inc.*, 75 F.3d

1069, 1084 (6th Cir. 1996).

To the extent there arguably is a resemblance between this

case and either mass torts, on the one hand, or product liability

actions, on the other, this court rejects the implication that such

affinity *ipse dixit* compels the conclusion that common issues do

not predominate in this case.

Here, the most important individualized issues are the

temporal expanse of each class member's exposure to the alleged

27

racially hostile environment, and, the extent of any psychological injury he or she sustained as a result of it. All other relevant facts bearing upon the core issue of liability are common, and could be answered once for the class as a whole. "[W]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action will be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately." 7A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1778, at 529 (2d ed. 1986)(footnote omitted).

Ultimately, Rule 23(b)(3)'s predominance inquiry is designed to test "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products*, 117 S.Ct. at 2249 & n.19 (emphasis supplied). For example, Rule 23(b)(3)(A) instructs district courts to consider "the interest of members of the class in individually controlling the prosecution ... of separate actions." In that regard, there is no evidence before this court suggesting that "[t]he interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action." Advisory Committee Notes to 1966 Amendment, 28 U.S.C.A. Rule 23, at 386. To the contrary, the following factors, among others, clearly indicate that the proposed class has "a high degree of cohesion and prosecution of the action through representation would be quite unobjectionable...." *Id.*

- ■ No individual has opted out of the class to pursue his or her own litigation.

28

- With one lone objector, there also is a relative lack of opposition to the proposed settlement.[31]

- Common issues constitute a significant part of each class member's case and, in the event claims were separately tried, would require the same proof for each class member.

- This case involves a discrete class of 141 present and former employees working in a single manufacturing facility; consequently, most class members should know personally some or all plaintiffs.

- Here, the class representatives, especially those who filed formal charges of discrimination with the EEOC, suffered a delay of several months in addressing their personal claims, and obtained a class-wide tolling of the period of limitations during negotiations, in fulfillment of their fiduciary responsibilities to unnamed class members.[32]

- Moreover, "the amounts at stake for individuals may be so small that separate suits would be impracticable." *Id.*

Indeed, separate actions would be unattractive for many members of the putative class, because their damages would be limited by varying degrees of exposure to the allegedly hostile environment. The Advisory Committee responsible for the present text of Rule 23(b)(3) "had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Products*, 117 S.Ct. at 2246 (citation and internal quotation marks omitted). Here, class counsel represent that:

> Although some class members in *Dowdell*—including the lone objector—will receive the maximum class-member recovery of $24,011.37, such a stake in litigation is plainly insufficient to justify the full-court press that would be required in

---

[31] It is significant to observe that, even that objector does not challenge the prosecution of this case as a class action; rather, she seeks to be favored with an incentive award, without otherwise altering the terms of settlement.

[32] With regard to the tolling issue, see note 12 *supra*.

> order to prevail in individual litigation. *Dowdell* is more
> akin to the "without effective strength" cases described by
> *Amchem Products*.

(Plaintiffs' memorandum in support of the grant of final approval
to the consent decree at 7.)

In that regard, the following factors clearly suggest there is
no interest among the "individual members of the class in
controlling their own litigations and carrying them on as they see
fit."[33]

- ■ Counsel represent there are no identical or similar
  actions pending against defendants, except for the claims
  that 18 charging parties filed with the EEOC, all of
  which will be settled if this court approves the proposed
  Consent Decree.

- ■ No individual has opted out of the class to pursue his or
  her own litigation; no one has sought to intervene.

  - ● *Nota Bene*: the foregoing observations address Rule
    23(b)(3)(B)'s instruction that a court consider
    "the extent and nature of any litigation concerning
    the controversy already commenced by ... members of
    the class."

- ■ The proposed settlement assumes all class members have
  recoverable claims.

- ■ Each person who elected to file a separate action would
  exchange certain severance benefits for an uncertain

---

[33] Advisory Committee Notes to 1966 Amendments, 28 U.S.C.A. Rule 23, at
386. *See also* Georgine v. Amchem Products, Inc., 83 F.3d 610 (3rd Cir. 1996),
*aff'd sub nom.* Amchem Products, Inc. v. Windsor, __ U.S. __, 117 S.Ct. 2231, 138
L.Ed.2d 297 (1997), where the Third Circuit observed:

> This case also suffers from serious problems in the fairness
> it accords to the plaintiffs. Each plaintiff has a significant
> interest in individually controlling the prosecution of separate
> actions. ... [T]his action involves claims for personal injury and
> death—claims that have a significant impact on the lives of the
> plaintiffs and that frequently receive huge awards in the tort
> system. ... <u>Plaintiffs have a substantial stake in making
> individual decisions on whether and when to settle</u>.

*Georgine*, 83 F.3d at 633 (emphasis supplied). For reasons discussed in text, the
present action is <u>not</u> such a case.

individual judgment.[34]

■ The time and expense required to establish liability on a case-by-case basis would be great, exceeded only by "[t]he burden that separate suits would impose upon the party opposing the class, or upon the court calendars...."[35]

■ The closure of the Huntsville plant makes prospective injunctive relief unavailable.

Based upon the foregoing, and other evidence of record, this court finds that common issues predominate over individual issues. The class proposed in this case is more bound by a mutual desire to rectify shared grievances than it is divided by individual interests.

### (iii) Superiority

This court also must determine under Rule 23(b)(3) whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Class counsel submit the following considerations to demonstrate that a class action "is superior to other available methods":

■ Class members will receive damages for emotional distress

---

[34] *See* plaintiffs' memorandum in support of the grant of preliminary approval to the consent decree (Doc. No. 12) at 11-12, reflecting defendants' position that severance benefits will not be awarded to those employees retaining claims against Ona upon the closing of the Huntsville plant:

Another advantage of the settlement class is that class members and the named plaintiffs will not be required to waive their right to the collectively-bargained severance benefits in order to preserve their rights in this action. Absent a settlement, a choice would have to be made concerning the relative value of a definite amount in the hand shortly and an indefinite amount that might be awarded at an indefinite date in the future. Given the economic realities facing numerous workers who will at least temporarily be without jobs when the plant shuts down, plaintiffs fear that many class members will decide to release all of their claims in return for the definite amount of severance payments. ...

[35] Advisory Committee Notes to 1966 Amendments, 28 U.S.C.A. Rule 23, at 386.

31

> without submitting to highly invasive Rule 35 mental examinations, which unquestionably would be required in litigation.

- ■   Class members will not be required to waive their right to severance benefits in exchange for maintaining the right to recover for alleged civil rights violations.

- ■   The "alternative method" of litigating "test cases" is inferior, because that method is best utilized to resolve the legality of ongoing practices, which are absent from this action.

- ■   Test case litigation also is inferior, because it prevents a jury from awarding class-wide punitive damages.

- ■   As a practical matter, test cases ultimately would lead to another proposed class settlement. Counsel for the class would review the awards granted by the test case juries, and propose a settlement based on those awards. Thus, this court would be presented with a class settlement involving fewer class members, and offering a lower settlement amount, due to the expenses of litigation.

- ■   The proposed settlement provides for payment of plaintiffs' attorneys' fees by defendants. Without class settlement, litigants would bear the costs of individual suits, either by paying a retainer or sacrificing a portion of a jury award under a contingency fee arrangement.

(Plaintiffs' memorandum in support of the grant of preliminary approval to the consent decree (Doc. No. 12) at 11-13.)

This court finds those considerations persuasive; accordingly, they are adopted, and serve as the basis for concluding that the proposed "class action is superior to other available methods."

Based upon the foregoing, and other evidence of record, the court therefore finds that certification of the proposed class is appropriate, and final certification for purposes of settlement is granted to a class defined as:

32

> All African-Americans who have been employed by Ona Corporation at its Huntsville, Alabama manufacturing facility at any time from February 19, 1993, through January 11, 1997.

**B. Fairness of the Proposed Settlement**

The policy of federal courts, favoring voluntary resolution of litigation through settlement, is particularly strong in the context of class actions. *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977).[36] Notwithstanding such proclivity, Federal Rule of Civil Procedure 23(e) mandates: "A class action shall not be dismissed or compromised without the approval of the court."

The district court's primary responsibility when evaluating a proposed class action settlement pursuant to Rule 23(e) is to decide whether it is "fair, reasonable, and adequate under the circumstances and whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." *Manual for Complex Litigation Third* § 30.42, at 238 (1995); *see also, e.g., Leverso v. SouthTrust Bank*, 18 F.3d 1527, 1530 (11th Cir. 1994); *In re Smith*, 926 F.2d 1027, 1028-29 (11th Cir. 1991); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

**1. Standards for evaluating fairness**

Factors which may be weighed in a scale of values, when mentally assaying such ephemeral qualities as "fairness, reasonableness, and adequacy," include the following:

---

[36] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit cases submitted or decided prior to October 1, 1981.

33

     (1)   the strength of plaintiffs' case;

     (2)   the reasonableness of the settlement in light of the attendant risks of litigation, and, the best possible recovery;

     (3)   the judgment of experienced counsel for the parties;

     (4)   whether there is evidence of collusion;

     (5)   the extent of discovery and the stage of the proceeding;

     (6)   the expected length, complexity, and expense of further litigation; and,

     (7)   objections to the settlement.

*See, e.g., Manual for Complex Litigation Third* § 30.42, at 238; *Cotton*, 559 F.2d at 1330-31. Where, as here, the settlement of class claims includes a lump sum payment, the court also must approve a plan for allocating the settlement proceeds among class members. *See* 3 *Newberg on Class Actions* § 12.35. Finally, a disparate distribution favoring the named plaintiffs requires careful judicial scrutiny into whether the settlement allocation is fair to the absent members of the class. *Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir. 1983).

### 2.   **Application of standards to facts**

This court has reviewed the proposed settlement in light of the foregoing standards, and makes the following findings.

- ■    The monetary relief provided to each class member is substantial, and satisfies plaintiffs' primary litigation objective.

- ■    The amount of such monetary relief and other terms of agreement, when balanced against the attendant risks of litigation, indicate the settlement is reasonable. The outcome of this case, if it were to proceed to trial, is uncertain.

34

- ■ For such reasons, experienced counsel fully support the settlement.

- ■ While the parties did not engage in *formal* discovery, that does not compel a conclusion that counsel lack sufficient information to assess the relative merits of claims and defenses.[37]  This court is satisfied that, after more than one year of *informal* discovery, counsel are fully aware of the relative strengths and weaknesses of this case.

- ■ Absent settlement, the parties face considerable expense in litigation over class certification, liability, and remedial issues.

- ■ There is no evidence indicating settlement is the product of fraud, duress, or collusion.  That conclusion is demonstrated by a number of factors, including: approval by the Equal Employment Opportunity Commission; the length and complexity of the settlement agreement itself, and the trade-offs reflected therein; and, the context in which the settlement was reached (*i.e.*, following lengthy, informal discovery and arms-length negotiations conducted by experienced attorneys, and also involving counsel for the EEOC).

- ■ Although defendants have agreed to pay class counsel "reasonable" attorneys' fees and expenses, the specific amount of such payment was not negotiated by class counsel prior to agreement on the merits; indeed, the amount of any such payment still has not been determined.[38]

- ■ The fact that there is only one pending objection, and, that no person elected to opt-out of the settlement class, strongly indicate that class members as a group view the settlement as fair and adequate.

- ■ The proposed method of distributing settlement funds among class members — a formula under which each class member will be paid a *pro rata* share of the amount remaining after payment of incentive awards to named plaintiffs, based upon the number of days that he or she was employed during the relevant period — is a fair and

---

[37] *Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977)(also holding that discovery, in its most efficient utilization, *should be* totally extra-judicial; informality in the acquisition of relevant facts is desirable).

[38] Compare to Manual for Complex Litigation Third § 30.42, at 239 (1995).

35

>                reasonable method of approximating relative amounts of
>                compensatory damage.

### (a) Incentive awards

The term of settlement which caused this court greatest pause
is the provision requiring that each named plaintiff be paid
$10,000, in addition to the amount he or she shall receive as a
class member. (Proposed Consent Decree (Doc. No. 14) ¶ 12.a, at 3.)
The 32 named plaintiffs comprise 22.7 percent of the class of 141
persons. The aggregate amount of incentive awards to be paid them
($320,000) constitutes 12.8 percent of the total settlement. If
that amount is included in the total recovery for all class
members, rather than paid to the named plaintiffs, the average
award for each class member increases by 14.7%, from $15,460.99 to
$17,730.50.

The Eleventh Circuit holds that "a disparate distribution
favoring the named plaintiffs requires careful judicial scrutiny
into whether the settlement allocation is fair to the absent
members of the class," and that "a substantial burden falls upon
the proponents of the settlement to demonstrate and document its
fairness." *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1147,
1148 (11th Cir. 1983).[39] Even so, a disproportionate distribution
raises only an _inference_ of unfairness, which

>        may be rebutted by a factual showing that the higher
>        allocations to certain parties are rationally based on
>        legitimate considerations. Settlements entailing dispro-
>        portionately greater benefits to named parties are proper only

---

[39] In *Holmes*, the Eleventh Circuit rejected a settlement in which eight
named plaintiffs were to receive approximately one-half of a $43,775 lump-sum
back-pay award made to a class of 126 persons with the remainder distributed
among the other 118 members of the class.

> when the totality of circumstances combine to dispel the "cloud of collusion which such a settlement suggests."

*Id.* at 1148 (citations omitted).

When examining the totality of circumstances, courts review a wide range of "legitimate considerations," including:

> (1) the actions taken by the class representatives to protect the interests of class members and others; (2) whether those actions resulted in substantial benefit to the class members; and (3) the amount of time and effort spent by the class representatives in pursuing the litigation.

*Spicer v. Chicago Board Options Exchange, Inc.*, 844 F. Supp. 1226, 1266 (N.D. Ill. 1993).[40] Other "legitimate considerations" which tend to dispel the "cloud of collusion" are:

- the general public policy in favor of amicable settlement of legal disputes, which is especially favored in Title VII cases[41];

- EEOC endorsement of the settlement[42];

- lack of objections by class members[43];

---

[40] Other cases discussing incentive awards for the efforts of, and risks incurred by, class representatives include: White v. National Football League, 41 F.3d 402, 408 (8th Cir. 1994); Thornton v. East Texas Motor Freight, 497 F.2d 416, 420 (6th Cir. 1974); In re Southern Ohio Correctional Facility, 175 F.R.D. 270, 275-76 (S.D. Ohio 1997); Van Vranken v. Atlantic Richfield Co., 901 F. Supp. 294, 299 (N.D. Cal. 1995); In re Domestic Air Transportation Antitrust Litigation, 148 F.R.D. 297, 358 (N.D. Ga. 1993); Enterprise Energy v. Columbia Gas Transmission, 137 F.R.D. 240, 250 (S.D. Ohio 1991); In re Dun & Bradstreet Credit Service Customer Litigation, 130 F.R.D. 366 (S.D. Ohio 1990); and, Huguley v. General Motors Corp., 128 F.R.D. 81, 85 (E.D. Mich. 1989), *aff'd*, 925 F.2d 1464 (6th Cir.), *cert. denied*, 502 U.S. 909, 112 S.Ct. 304, 116 L.Ed.2d 247 (1991).

[41] *Women's Committee v. National Broadcasting Co.*, 76 F.R.D. 173, 181 (S.D.N.Y. 1977).

[42] *Id.*

[43] *Id.* In *Women's Committee*, the court noted that one class member objected by letter that she, too, should have been included as a named plaintiff "on account of her early activities in support of ... efforts to eliminate sex discrimination at NBC." *Women's Committee*, 76 F.R.D. at 182. The court stated: "We certainly have no control over the selection of parties plaintiff who choose to file a lawsuit, and in any event we note that she does not object specifically to any terms of the settlement, either as they apply to the class or to the named plaintiffs," but merely to the fact that she was not included as a named plaintiff. *Id.* A second class member raised an unrelated, but meritless and untimely, objection which also was summarily dismissed by the court. *Id.*

37

- the risk to job security and good will with coworkers[44]; and,

- the notoriety and personal difficulties encountered by class representatives.[45]

Each consideration is present in this case. Accordingly, this court finds that the additional incentive payments to the named plaintiffs are not disproportionate to the efforts they have undertaken on behalf of the class and the personal risks incurred thereby. The record reflects that each plaintiff: had extensive personal involvement in bringing to light those facts that culminated in this lawsuit; obligated him- or herself to participate in the litigation process; and, risked the stigma of suing his or her employer, at a time when each was seeking new employment because of the announced closure of the Ona facility. Given these and other efforts in advancing the litigation, it is fair and reasonable to accord the named plaintiffs preferential consideration.

### (b)  The remaining objection

Class member Dorothy Harper contends she also should receive a $10,000 incentive payment, commensurate with each of the named plaintiffs.  As the preceding discussion should make clear, however, incentive awards in a class action are justified only when representatives make significant contributions to the class litigation process.  Such awards are designed to compensate representatives for services provided to the class, and to minimize

---

[44] *Id.*

[45] *Van Vranken*, 901 F. Supp. at 299.

any financial penalty each may suffer as a result of suing on behalf of all, rather than individually. Ms. Harper has not presented, either in her written objection or her oral testimony, substantial evidence that she is deserving of such an award. Consequently, the objection is overruled.

For all of the foregoing reasons, and upon consideration of other evidence of record, this court finds that the terms of the proposed Consent Decree are fair, reasonable, and adequate under the circumstances, and that the interests of the class as a whole are better served if this action is resolved by settlement, rather than pursued by means of separate actions.

An appropriate judgment consistent with this memorandum opinion shall be entered contemporaneously herewith.

**Done** this 13th day of February, 1988.

United States District Judge

39